JOHN A. DEVAUGHN AND CAROLYN M. DEVAUGHN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De Vaughn v. Commissioner
Docket No. 10844-75.
United States Tax Court
T.C. Memo 1983-712; 1983 Tax Ct. Memo LEXIS 84; 47 T.C.M. (CCH) 461; T.C.M. (RIA) 83712; November 29, 1983. *84 Petitioners failed to report on their Federal income tax returns income received from unlawful activities. Held, petitioners failed to report $168,643.11 and $177,112.38 taxable income for the years 1971 and 1972, respectively. Held further, both petitioners are liable for the additions to tax for fraud under sec. 6653(b), I.R.C. 1954. Peter G. Angelos and Shepard A. Hoffman, for the petitioners. Daniel J. Wiles and Clare J. Brooks, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated September 25, 1975, respondent determined deficiencies in petitioners' Federal income taxes. Subsequently concessions were made with the consequence that the deficiencies remaining in issue are as follows: Taxable year
Addition to tax
ended Dec. 31,
Deficiency
pursuant to sec. 6653(b)
1971
$95,307.43
$47,653.71
1972
101,294.58
50,647.29
The issues for decision are (1) whether petitioners had unreported income for the tax years 1971 and 1972, and, if so, by what amount, and (2) whether respondent has established by clear and convincing evidence that part of the underpayment of income tax, if any, for each of these years was due to Mrs. DeVaughn's *85 fraud with intent to evade tax. This Court has already ruled that the completed contract method was unavailable to the petitioners in reporting their income for 1971 and 1972. This Court has also ruled after a concession by petitioners that Mr. DeVaughn is estopped from denying his liability pursuant to section 6653(b), I.R.C. 1954, for both years at issue by virtue of his conviction for violating section 7201 for both years. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, John A. DeVaughn and Carolyn M. DeVaughn, were residents of Lusby, Maryland at the time they filed their petition in this case. Mr. and Mrs. DeVaughn timely filed joint Federal income tax returns for the taxable years 1971 and 1972 with the Internal Revenue Service Center at an unspecified location. During 1971 DeVaughn worked for the Bechtel Corporation, which was the general contractor for an atomic power plant construction project for the Baltimore Gas and Electric Company in Calvert Cliffs, Maryland. DeVaughn's job at Bechtel was to monitor subcontracts between Bechtel *86 and its subcontractors at the Calvert Cliffs project. Although he left Bechtel in October 1971, DeVaughn's association with certain Bechtel subcontractors continued through 1971 and into 1972. As a result of his position with Bechtel, DeVaughn, with the assistance of his wife, was able to arrange for kickbacks from Bechtel subcontractors who wished to see competitors' bids before submitting their bids to win contracts with Bechtel. DeVaughn was also able to extract payments from these subcontractors by threatening to stop progress payments, or to terminate contracts altogether. These subcontractors included Campbell-McCormick, Inc., Ajax Soil-Cement Company, Cherry Hill Sand and Gravel Company, Regal Construction Company, Inc., F & T Construction Company, Adelphi Builders, and the Albert Beever Companies.In order to disguise the source of the funds received from these subcontractors, the DeVaughns, or others at the DeVaughns' direction, opened four bank accounts in fictitious company names. The DeVaughns also paid money to Lyle Leeper, Erston Magis, Thomas Allen, Robert C. Williams, Roland Cumor and Rocco Luppino, employees of Bechtel or the subcontractors, who assisted in obtaining *87 the money from the subcontractors. Many of these funds were deposited into four bank accounts which the DeVaughns or their subordinates opened in fictitious company names. Nancy Fales, the wife of one of DeVaughn's subordinates, opened an account in the name of Free State Equipment Rentals (hereinafter Free State) at the Maryland National Bank. DeVaughn supplied the address for this account. Nancy Fales endorsed all Free State checks in blank and gave them to DeVaughn. Carville A. Hollingsworth, Jr., the husband of DeVaughn's niece, Kathleen Hollingsworth, opened an account for Construction Services, Inc. (hereinafter CSI) with the Equitable Trust Company, using an address which DeVaughn provided. DeVaughn told Mrs. Hollingsworth that he did not want Bechtel to learn of the existence of this account. Mr. and Mrs. Hollingsworth signed many CSI checks in blank and cashed other checks, giving the money to Mr. or Mrs. DeVaughn. Mrs. DeVaughn usually directed the movement of funds into and out of the CSI account. At Mrs. DeVaughn's request, Sheila George, another of DeVaughn's nieces, opened an account with the Union Trust Company in the name of Associated Contractor Services, Inc. *88 (hereinafter ACS). The address for ACS was a post office box which Mrs. George rented at Mrs. DeVaughn's request. Mrs. George would sign blank ACS checks or sign ACS checks payable to Mas. DeVaughn and send then to Mrs. DeVaughn. Occasionally she would cash checks and give the cash to Mr. Or Mrs. DeVaughn. In addition checks from subcontractors would arrive at the post office box and Mrs. George would deposit them into the account. Joan Rebstock, a secretary for DeVaughn, opened an account in the name of Rental Equipment Company (hereinafter REC) with the Colonial Bank and Trust Company. The REC address provided to the bank was a telephone answering and message center in Annapolis, Maryland. The signatories of the account were Joan Rebstock and "John A. White." DeVaughn signed the name John A. White on the account signature card and used this signature in signing checks drawn on the account. None of the businesses (hereinafter the four accounts) for which the above-described accounts were opened were incorporated, nor did they engage in any business. The DeVaughns' underlying motives for opening the accounts were to prevent Bechtel from discovering that its subcontractors *89 were making payments to the DeVaughns and to conceal from the government the fact that the DeVaughns were receiving this money, thus preventing the government from collecting income tax. DeVaughn did not give his social security number in opening the accounts. In addition to the above-described accounts, the DeVaughns had two personal joint accounts at the American National Bank and the Calvert Bank and Trust Company. DeVaughn had a personal account at the Equitable Trust Company. After leaving Bechtel, DeVaughn set up his won business under the name of Affiliated Contract Consultants (hereinafter ACC).On March 1, 1972, this business was incorporated in the name of Affiliated Contract Consultants, Inc. (hereinafter ACCI). The DeVaughns opened checking and savings accounts for ACC and ACCI. While ACCI was engaged in legitimate contracting business, the DeVaughns deposited monies received from Bechtel subcontractors into ACCI accounts. This was true, even though the subcontractors dealt with DeVaughn rather than ACCI, payments deposited arose from deals entered into before ACCI was incorporated, and DeVaughn had no covenants not to compete with ACCI. The DeVaughns would deposit *90 money into ACCI accounts when the corporation needed money. In its first year of operation ACCI generated large losses. DeVaughn earned the income at issue in a series of schemes in which he made use of, and sold, his influence at Bechtel for his own profit. Mrs. DeVaughn was aware of her husband's dealings with the subcontractors and actively participated in DeVaughn's schemes by keeping books, records, and transferring funds from the four accounts to her own and her husband's possession. Western Contracting Corporation
DeVaughn entered into an agreement with Western Contracting Corporation (hereinafter Western) for which Neil Dawson was the project manager at the Calvert Cliffs project. This agreement provided DeVaughn with a portion of Western's billings to Bechtel, specifically, 2 cents per cubic year of material that Western dredged and 10 percent of Bechtel's payments to Western for "stand-by time." In furtherance of the scheme, Mrs. DeVaughn would send Western a false invoice in the name of one of the four accounts. Western would then issue a check to whichever company was indicated on the invoice. These amounts totaled $46,750 in 1971 and $58,045.92 in 1972. The following *91 is a list of the checks issued by Western to the petitioners and the payees of the checks: Date
Amount
Payee
3/15/71
$12,000.00
Free State
6/4/71
7,750.00
Free State
7/2/71
7,000.00
CSI
11/2/71
20,000.00
ACS
Total for 1971
$46,750.00
2/18/72
$ 4,000.00
ACC
3/3/72
20,000.00
REC
5/4/72
8,045.92
Mid-Atlantic
5/12/72
8,000.00
REC
5/12/72
4,000.00
ACC
7/28/72
14,000.00
REC
Total for 1972
$58,045.92
The check for $4,000, dated May 12, 1972 and issued to Affiliated Contract Consultants, was deposited in the account of ACCI on May 23, 1972. The check dated May 4, 1972 was in the amount of $8,045.92 to Mid-Atlantic Environmental Control Company (hereinafter Mid-Atlantic) and was endorsed by Howard R. Brosenne for Mid-Atlantic. Mid-Atlantic was never incorporated. Both Mid-Atlantic and ACCI had the same address. DeVaughn co-signed Mid-Atlantic checks. All of the monies enumerated above, including those paid to Mid-Atlantic, were paid to DeVaughn and his associated companies. In the year 1972, at least two checks drawn on Mid-Atlantic's account totaling $8,849.82, were deposited into the ACCI account. Campbell-McCormick, Inc.
Robert McCormick was general manager of Campbell-McCormick, Inc. John DeVaughn and Robert McCormick *92 arranged a deal through Roland Cumor, an employee of Campbell-McCormick, whereby Campbell-McCormick could submit the winning bid for a contract with Bechtel by examining the competitors' bids before submitting its own. The fee for viewing the bids was $1,500, which McCormick paid in full before 1971. Further, Campbell-McCormick was to pay $250 per week for the life of the contract. Payments were to begin when Campbell-McCormick had 12 men working at the Bechtel site at Calvert Cliffs. In the last week of June 1971, McCormick made his first payment of $500. The payments continued through 1971 and 1972 into 1973. McCormick paid a total of $5,750 in 1971 and $13,000 in 1972. Sometimes McCormick would fall behind in the payments and then pay for as many as 4 to 6 weeks at one time. Generally, the payments were made biweekly. McCormick would cash a salary check and give the money to Roland Cumor. Cumor would take 20 percent, generally $100 for each $500 payment, and give the remainder to John DeVaughn. In the spring of 1972, McCormick started making the cash payments to DeVaughn directly after he left Bechtel and started his own business. Cumor asked DeVaughn to continue paying *93 him the 20 percent of McCormick's payments. DeVaughn agreed, but made only two $100 payments to Cumor after Cumor stopped delivering McCormick's cash payments. Petitioners did not report any of these monies in their tax returns for 1971 or 1972. When DeVaughn left Bechtel, McCormick delayed some of the payments to see if they were still necessary; however, he continued making the payments in the belief that DeVaughn's influence at Bechtel had persisted. McCormick received no invoices for these cash payments until April 24, 1973, following a dispute between McCormick and DeVaughn over whether he had made a payment. After its first 3 days of presence at the Calvert Cliffs site, Campbell-McCormick received additional work, air-conditioning duct work on auxiliary buildings at the site. DeVaughn requested 10 percent of the billing on this work and agreed to take checks for these payments instead of cash. McCormick agreed to pay these amounts. Cumor would provide DeVaughn with the figures, and someone associated with DeVaughn, generally Carolyn DeVaughn, would send Campbell-McCormick invoices purportedly issued by one of the four accounts, listing items that Campbell-McCormick did *94 not rent and which the company did not own. Campbell-McCormick generally would receive these invoices the same day they received the check from Bechtel and would issue a check to the company listed on the invoice and would give the check to Roland Cumor. Cumor would deliver these checks to DeVaughn. In the spring of 1972, McCormick delivered the checks himself along with the cash. Finally, in 1972 McCormick paid DeVaughn $10,000 by check to see competitors' bids on work in Connecticut. Although McCormick did not receive this bid, none of this money was ever returned. The McCormick checks were deposited into the DeVaughns' accounts in amounts as follows: 1971
1972
Free State
$1,871.30
-
ACS
4,322.81
$ 5,820.33
CSI
1,873.27
-
REC
-
54,456.99
$8,067.38
$60,277.32
Ajax Soil-Cement Company.
During 1970 and 1971, Glen Wheeler was president of Ajax Soil-Cement Company (hereinafter Ajax) and he was associated with BMR Landscaping, Inc. (hereinafter BMR). In 1971 these companies were working on the Calvert Cliffs site for Bechtel, where John DeVaughn was working as a contract engineer. In addition, Mrs. DeVaughn was working in Bechtel's accounts payable department. Wheeler met with DeVaughn in a parking *95 lot where DeVaughn asked Wheeler to pay him certain money that Ajax had received from Bechtel. Wheeler refused to comply with DeVaughn's request. Subsequently, Ajax failed to receive progress payments from Bechtel in the amount of $300,000. Consequently, Ajax was unable to meet its payroll. Wheeler therefore paid the amounts DeVaughn requested. He made these payments by checks. Generally, DeVaughn told Wheeler's secretary the amount and the payee for these checks. In 1971 checks amounting to $36,000 and $21,500 from Ajax were deposited into the ACS and CSI accounts, respectively. In the summer of 1973, Wheeler met with Mrs. DeVaughn. She requested that Wheeler sign a document concerning dealings between DeVaughn and Wheeler. However, the document did not recite any facts that had occurred with respect to payments and Wheeler refused to sign it. Ajax and BMR expended momey for materials and labor used in improving DeVaughn's house at DeVaughn's request. Wheeler discovered that men, who were supposedly working at Bechtel, were in fact working on the DeVaughns' residence. The cost of materials used on DeVaughn's house was $4,873.11. Wheeler's secretary, using the time sheets *96 of the employees who worked at the DeVaughn house, calculated the cost of the labor, including a 10 percent markup, and arrived at a figure of $21,819.32. Ajax also paid a surveyor for work performed on the DeVaughns' property in the amount of $350. Finally, Ajax paid for repairs to Carolyn DeVaughn's car in the amount of $103.66. These services were performed in 1971. The DeVaughns disputed the labor cost. They never paid for this work and Ajax never sent them a bill. Cherry Hill Sand and Gravel Company, Regal Construction Company, Inc., and F & T Construction Company.
Rocco Luppino owned and controlled Cherry Hill Sand and Gravel Company, Regal Construction Company, Inc., and F & T Construction Company. Through Lyle Leeper, and employee of Bechtel, Luppino met with DeVaughn and entered an arrangement with him whereby DeVaughn would provide Luppino with information necessary for winning contracts with Bechtel in return for a percentage of such contracts. These fees were paid to DeVaughn who split them with Leeper. The first payment occurred in 1971 and was paid in cash. Thereafter, DeVaughn agreed to accept checks. DeVaughn instructed Luppino with respect to the payee of *97 the check.Luppino then issued checks as per DeVaughn's instructions.Luppino's companies made payments to DeVaughn's companies as follows: 1971
DeVaughn Company
Regal Construction
Cherry Hill
Total
Free State
-
$ 5,000.00
ACS
$ 6,908.80
8,065.00
CSI
3,332.10
24,567.00
$10,240.90
$37,632.00
$47,872.90
1972
F & T
REC
$2,000.00
In addition, Luppino gave DeVaughn a Regal Construction Company, Inc. check, dated November 30, 1971, for $2,024.15 issued to Associated Contractors Services. On the back of the check, "Associated Contractors Services" is typewritten, and the name "Sheila E. George" is handwritten. Mrs. George did not endorse the check; however, DeVaughn never complained to Luppino that he had not received this money. In addition, in late 1971, Regal Construction Company, Inc. owned a boat which Luppino had purchased for $6,000. DeVaughn told Luppino that he wanted this boat as additional compensation for the efforts DeVaughn had expended in Luppino's behalf. At the time the boat was worth only about $3,000 due to some damage which occurred subsequent to the purchase. Luppino signed the boat over to DeVaughn, who never paid for it. Mrs. DeVaughn accepted a bill of sale from Luppino even though *98 to her knowledge neither she nor DeVaughn ever paid for the boat. Luppino did not receive a split from the Cherry Hill Sand and Gravel checks which DeVaughn received. Adelphi Builders.
In the summer of 1971, DeVaughn informed Luppino that an additional contract from Bechtel would be available. Luppino felt his company did not have the requisite expertise for this contract. He therefore introduced Leslie Wattay, president of Adelphi Builders, to DeVaughn. Luppino, Leeper and DeVaughn agreed that they would assist Wattay in acquiring the contract in return for 10 percent of Adelphi's gross return from the contract. They further agreed to split this return among themselves. Wattay did win the contract and paid the money. The first payments consisted of cash and later approximately half cash and half checks. Wattay acquired the cash by cashing checks drawn on Adelphi accounts. Wattay gave the cash to Luppino in a sealed envelope. Luppino then delivered the cash to DeVaughn, who was recognized as being in charge of this operation, or to Leeper and DeVaughn together. Then DeVaughn would pay Luppino his share with a check. Sometimes Luppino would give the sealed envelope containing *99 cash to Leeper who would give the envelope to DeVaughn unopened. DeVaughn gave some cash to Leeper. Respecting the checks, DeVaughn would identify the payee of the check to Luppino who in turn would so instruct Wattay. Wattay would write checks with either a named payee as per DeVaughn's instructions or with no named payee. Luppino would deliver the checks along with the cash.He gave two of the Wattay checks totaling $5,000 to Leeper in October or November 1972. Leeper attempted to proffer these checks to DeVaughn who refused them saying that he had more than his share of the money from the arrangement and that Leeper should keep the checks himself. These checks were issued to Renovation Supply and Construction Compamy and totaled $5,000. Neither Leeper nor Luppino kept track of the money owed them, and they relied upon DeVaughn to render the proper amounts. In 1971 Adelphi Builders issued checks totaling $28,100 in payment of the arrangement. Twelve thousand dollars' worth of these checks were deposited into DeVaughn accounts; $4,000 was deposited into the Free State account, $3,000 into the CSI account, and $5,000 into the ACS account. [1] Wattay cashed the remaining checks *100 and gave the cash to Luppino as described above. These checks totaled $16,100. However, only $16,000 of this was given to Luppino because Wattay retained $100 from one of the checks for petty cash. In 1972 Adelphi Builders issued checks toward this arrangement totaling $38,375. [2] Checks totaling $13,500 were issued to DeVaughn accounts, but of this amount $5,000 was given to Lyle Leeper as noted above, leaving $8,500 which was deposited into the Rental Equipment account. Of the remaining checks, Wattay cashed $21,875 worth, giving the cash to Luppino for delivery to DeVaughn. DeVaughn also requested that Wattay and Adelphi work on DeVaughn's house in late 1971. Wattay, through his own employees and subcontractors, completed this *101 work during 1972. Wattay then told Luppino that he wanted the value of the work credited against the 10 percent he was paying to DeVaughn for the contract with Bechtel. DeVaughn agreed to this arrangement, and Wattay prepared a list of costs of the labor and materials expended on DeVaughn's house. The list was created after the work was almost finished, and Wattay's employee arrived at a total cost of $6,607.92, estimating the cost of the electrical work for which Wattay had not yet received a bill. The DeVaughns contested this amount, believing that the cost of the electrical work was excessive. The electrical work was approximated at $3,300. In fact, the electrical subcontractor's bill was $3,309.92, which amount Wattay paid. Albert Beever Companies.
In the middle of 1971, Leeper, DeVaughn and Albert Beever Company personnel met to discuss the acquisition for Beever of a contract with Bechtel respecting the Millstone Connecticut site. Beever did win one or more subcontracts with Bechtel. DeVaughn was to receive a percentage of the gross payments to Beever on the subcontracts. The date of one subcontract is November 15, 1971, and thus, DeVaughn had performed his services by *102 this time. DeVaughn or Mrs. DeVaughn sent false invoices to Beever listing the amount due, and Beever issued a check in whatever name appeared on the invoice. Beever issued one check to REC and, at DeVaughn's direction, voided the check and issued it to DeVaughn. In 1972, Albert Beever Company issued one $10,000 check to REC and five checks totaling $33,749.24 to ACC. Also, the Albert Beever Jr. Co. made payments to DeVaughn under similar circumstances. It issued one check to Jack DeVaughn in the amount of $5,000 and and three checks to ACC totaling $11,633.32 of which one check for $4,132 was reported as income on the 1972 return. The Albert Beever Company also paid $2,817.70 which amount was deposited into the ACCI account. Other than the check for $4,132, this money was unreported. The total amount received from Albert Beever and Albert Beever, Jr. in 1972 which the DeVaughns did not report was $59,068.26. In addition, money from Gleason Crane Rental was deposited into the CSI account in 1971. Splits.
To facilitate the flow of information necessary for the furtherance of their schemes, petitioners were required to pay fees or "splits" to certain other Bechtel employees *103 and occasionally to employees of the subcontractors. Among the group of individuals involved in the kickback and extortion schemes, DeVaughn was considered the leader. With the exception of the 20 percent that Roland Cumor took from the Campbell-McCormick cash payments to DeVaughn, all the money flowed into DeVaughn's pockets or one of his accounts after which he would pay his associates. None of these persons who received payments from DeVaughn kept contemporaneous records of these transactions. Petitioners also kept no such records. However, Mrs. DeVaughn prepared a disbursements journal and a receipts journal for DeVaughn's criminal trial. For this trial, she prepared a summary of the two journals which attempts to connect each split with an income item. The people who received payments from the DeVaughns were Erston Magis, Roland Cumor, Lyle Leeper, Robert C. Williams, Thomas Allen, and Rocco Luppino. The amounts paid to each of these individuals from each of the DeVaughn accounts for the year 1971 are as follows: Associated
Construction
Free State
Contract Services
Services, Inc.
Totals
Lyle Leeper
* *104 $4,440.00
$ 9,040.10 ** $20,780.50
$34,260.60
Erston Magis
2,500.00
5,000.00
1,000.00
8,500.00
Thomas Allen
360.00
999.00
187.00
1,546.00
Robert C. Williams
-
2,000.00
500.00
2,500.00
Roland Cumor
360.00
1,880.00
367.00
2,607.00
Rocco Luppino
-
-
4,300.00
4,300.00
Totals
$7,660.00
$18,919.10
$27.134.50
$53.713.60
Thus, $53,713.60 is the total amount of splits paid in 1971. The amounts paid to each of these individuals from each of the following accounts for the year 1972 are as follows: Rental
Associated
Equipment Company
Contractor Services
Totals
Lyle Leeper
$ 5,538.00
$2,000.00
$ 7,538.00
Erston Magis
12,800.00
-
12,800.00
Robert C. Williams
2,300.00
1,000.00
3,300.00
Roland Cumor
15,375.79
1,223.00
16,598.79
Thomas Allen
6,326.00
575.00
6,901.00
Rocco Luppino
3,000.00
-
3,000.00
Totals
$45,339.79
$4,798.00
$50,137.79 In addition, DeVaughn made payments of $3,000 from his personal accounts at Calvert Bank and Trust and American National Bank to these parties during 1972. Other checks were drawn on these accounts as indicated: Date
Account
Amount
Payee
5/14/71
Freestate
$1,500
Cash
6/17/71
Freestate
3,350
K.M. Hollingsworth
10/6/71
CSI
10,000
Cash
6/26/71
CSI
1,500
John DeVaughn
9/7/71
CSI
2,500
Cash
4/28/72
REC
6,500
C. DeVaughn
2/25/72
REC
1,500
K.M. Hollingsworth
Three checks *105 were drawn on the ACS account during 1971. One of these checks, dated November 5, 1971, in the amount of $4,038 lists "R. Lupino" as the payee. This is a misspelling of Mr. Luppino's name which has twop's.The check is endorsed "R. Lupino." Mrs. DeVaughn had spelled Luppino's name in this manner on other occasions. Luppino never signed this check, nor did he authorize anyone to sign it for him. His signature was forged. In 1971 Ann Santoiemma and Luppino were keeping company and were subsequently married. Two checks drawn on ACS, dated November 30, 1971 in the amount of $1,882.50 and December 23, 1971 in the amount of $2,500, respectively, listed A. Santoiemma as the payee.These signatures were forged. Attempts to conceal income.
In January 1972 Mrs. DeVaughn met with Bernita Smith, an accountant, for the purpose of preparing the DeVaughn's 1971 personal income tax return. Mrs. Smith prepared this return from information which Mrs. DeVaughn provided orally. Mrs. Smith was provided with the schedule C figure of $8,174, but did not learn the source of this item. Mrs. Smith's normal procedure, after receiving the information from a client, is to ask about the existence of any *106 other income. Nevertheless, Mrs. Smith never learned of either the Free State, CSI, or ACS accounts or the fact that the DeVaughns were receiving money through these companies. Also in March of 1972, Mrs. Smith had not learned that the DeVaughns or their businesses were receiving money from Western Contracting, Campbell-McCormick, or Adelphi Builders. Mrs. DeVaughn and Mrs. Smith decided to use the cash basis method of reporting income and deductions in preparing the 1971 return. Mrs. DeVaughn also sought Mrs. Smith's assistance in setting up the books for ACC which the DeVaughns operated as a proprietorship until 1972 when ACC was incorporated and became ACCI. In 1972, Mrs. Smith stopped working for the DeVaughns and did not close the books for ACCI. Normally, Mrs. Smith would discuss the possibility of using the completed contract method of accounting with a new client, but only if the client's business was of a type for which this accounting method was appropriate. Mrs. Smith never had reason to believe ACC, ACCI or the DeVaughns could employ the completed contract method. John Mitchell is a CPA who prepared the DeVaughns' personal income tax return for 1972 as well as ACCI's *107 corporate return for 1972. Mitchell began handling the accounting work for ACCI after its incorporation. In preparing the return, Mitchell used books which Mrs. DeVaughn provided him. During 1972, prior to filing the 1972 return, Mitchell briefly discussed the completed contract method of accounting with Mrs. DeVaughn. However, Mrs. DeVaughn did not provide Mitchell with enough information about the business to enable him to determine whether the completed contract method of accounting would have been appropriate. In any case, Mitchell prepared the 1972 personal income tax return using the cash basis method. Normally, Mitchell, after receiving the client's income, would ask whether the client received any other income. However, while preparing the 1972 return, Mitchell had not learned of the existence of the four accounts, nor did he know that the DeVaughns were receiving money through those accounts. The DeVaughns signed the personal return on April 15, 1973. The DeVaughns' returns for 1971 and 1972 omitted all of the income described above and claimed expenses in the amounts of $3,056 and $6,151.87, respectively. In May 1973 DeVaughn and Leeper received notice that the *108 Internal Revenue Service was investigating them. DeVaughn advised Leeper to avoid telling the IRS anything with respect to their activities. Together, the DeVaughns attended an interview with IRS agents on May 24, 1973 where they were represented by counsel. At that interview, both Mr. and Mrs. DeVaughn participated by answering questions and volunteering comments. Mrs. DeVaughn heard everything her husband said, but did not contradict him. Although the DeVaughns knew of the existence of the Four accounts and that they were receiving money through these accounts, DeVaughn denied such knowledge, and Mrs. DeVaughn remained silent in the face of these denials. When asked if he used any names other than his own, DeVaughn failed to mention that he had used the name "John A. White" in opening and using the REC account, again in the face of Mrs. DeVaughn's silence. Mrs. DeVaughn claimed that she and four secretaries handled the records for 1972 for ACCI, and that in January 1973 someone broke into the office and removed or destroyed some of these records.She stated that customarily she discarded bank records. Mrs. DeVaughn stated that they had paid Rocco Luppino $3,000 for a boat; *109 however, the DeVaughns never paid the $3,000. Mrs. DeVaughn stated that prior to 1971 she had saved about $16,000 at home and then deposited this money into their checking account in 1971. However, $16,000 in cash was not accumulated prior to 1971. On the day of the interview, the DeVaughns met with Leeper and told him that they had avoided telling the IRS agents anything. Mrs. DeVaughn said that she had lied to them. After the interview the DeVaughns constructed books for the years at issue, including the disbursements book and the receipts book, and the summpary. In compiling these books, Mrs. DeVaughn used notations in an executive diary, bank records and other papers. Upon completing the books, Mrs. DeVaughn destroyed the records except for the executive diary. DeVaughn told Leeper that they were trying to create the appearance that they had received $80,000 although they had, in fact, received much more than that. Mrs. DeVaughn brought these books to Mitchell, who then learned of the four accounts which the DeVaughns had been using to hide the source of funds. By September 1973, he prepared amended returns for the years 1971 and 1972. However, at the request of the *110 DeVaughns and their attorney Samuel Silber, Mitchell prepared returns for 1973 and 1974 using the completed contract method based upon information that the DeVaughns had provided him. Also, Mitchell prepared the ACCI return for the 1972 fiscal year on the cash basis. Mitchell did not learn any details respecting the activities of DeVaughn's companies, nor did he learn of any income other than that described in the books which Mrs. DeVaughn prepared. In order to substantiate payments to Cumor, Magis, Leeper, Luppino, Williams, and Allen, the DeVaughns requested in the summer of 1973 that these people prepare and tender receipts dated so as to reflect payments in 1971 and 1972. Carolyn DeVaughn prepared contracts between the fictitious accounts and the subcontractors who had paid DeVaughn to secure bids and work with Bechtel. Mrs. DeVaughn used a contract form which had been created in 1972, although she dated some of them as early as 1971. Mrs. DeVaughn, herself, requested that Wattay sign such a form, and he refused. On September 25, 1975, respondent mailed a notice of deficiency for the years 1971 and 1972 to the DeVaughns' last known address. This notice determined deficiencies *111 of $99,232.33 and $107,628.79 for 1971 and 1972, respectively. Respondent also determined additions to tax pursuant to section 6653(b) of $49,616.17 and $53,814.39 for 1971 and 1972, respectively. However, respondent concedes a reduction of $5,000 in the 1972 income. Also, respondent has allowed additional deductions of $7,100 and $4,000 for 1971 and 1972, respectively. On May 13, 1975, the Grand Jury for the District of Maryland returned an indictment charging the DeVaughns and others with various offenses with respect to the above-described activities. Mrs. DeVaughn, on July 18, 1975, entered a plea of guilty to Count 30 of this indictment. The Court accepted the plea and entered a judgment of guilty pursuant to the plea. Count 30 provided: And the Grand Jury for the District of Maryland further charges: On or about the 9th day of March, 1972, in the State and District of Maryland, JOHN A. DEVAUGHN and CAROLYN M. DEVAUGHN residents of Lusby, Maryland did willfully and knowingly make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 1971, which was verified by a written declaration that it was made under the penalties of perjury and *112 was filed with the Internal Revenue Service, which said income tax return they did not believe to be true and correct as to every material matter in that the said return reported gross income in the amount of $23,992.00 whereas, as they then and there well knew and believed, they received substantial income in addition to that heretofore stated. 26 U.S.C. sec. 7206(1). In support of this plea, certain facts were admitted by Mrs. DeVaughn: that the DeVaughns received money from subcontractors of Bechtel, and that the amount of money, with respect to the 1971 taxable year, was substantially in excess of that reported on the return. Mrs. DeVaughn was sentenced to 3 years' imprisonment, which sentence was suspended upon condition of probation. Respecting Mr. DeVaughn, on April 28, 1976, a jury in the United States District Court for the District of Maryland returned verdicts of guilty as to Counts 1, 2, 5, 7, 9, 10, 11, 12, 16, 17, and 30 of the May 13, 1975 indictment. The court entered judgments of guilty as to these counts and sentenced DeVaughn to 10 years' imprisonment. The Fourth Circuit upheld the conviction and sentence by an unpublished per curiam order dated May 4, 1977. *113 OPINION Unreported Income
The first issue for our consideration is whether the Devanughns received income for the years 1971 and 1972 which they failed to report on their returns for those years. At the outset, we pay the usual obeisance to the governing maxim that the deficiency determinations are presumptively correct, and therefore the DeVaughns bear the burden of proving that the deficiencies are erroneous. Welch v. Helvering,290 U.S. 111, 115 (1933). [3] During those years, DeVaughn was able to sell his influence at Bechtel in return for cash and services. He was able to provide competitors' sealed bids to various parties desiring subcontracts with Bechtel in order that such parties could construct their own bids in a manner to win subcontracts. In some instances he was able to provide these parties with additional work at Bechtel, again in exchange for a fee. DeVaughn forced several Bechtel subcontractors to pay him money, threatening that he would withhold their progress payments, or that they would lose the work entirely if he was not paid. To make his operation successful, DeVaughn had to share his receipts with certain *114 fellow employees at Bechtel or with employees of the subcontractors. He needed to procure the sealed bids, monitor billings and maintain the secrecy of his schemes. He used people to act as intermediaries between himsefl and the subcontractors, relaying terms of the deals and carrying cash and checks. These individuals also received payments from DeVaughn. In all these schemes, DeVaughn was the focal point. The money he received was either in the form of cash, which he received personally, or by checks which were deposited into accounts whch he and Mrs. DeVaughn controlled. The subcontractors would received invoices prepared by Mrs. DeVaughn setting forth the amount owed. DeVaughn kept track of the amounts owned by paying people to monitor the billings to Bechtel. None of the recipients to funds from DeVaughn kept records of the amounts DeVaughn paid them. They would rely upon DeVaughn to determine and pay the correct amounts from funds that he had at his disposal. In sum, DeVaughn was conducting a business, albeit illegal. The amounts paid him by subcontractors constituted gross income, sec. 61 (a), and amounts he paid to such as Cumor, Magis, Williams, Leeper, and Luppino *115 constituted business expenses. Arriving at figures for income and deductions, the respondent has calculated items of unreported taxable income for 1971 and 1972. Some of the items of income and expense have been stipulated. Amounts deposited into the four accounts.
Some of the funds which subcontractors paid DeVaughn were deposited into the four accounts which the DeVaughns opened or which were opened at the DeVaughns' request. The disposition of funds deposited into these accounts was entirely subject to the DeVaughns' discretion. Mrs. Fales endorsed the Free State checks and gave them to DeVaughn. The Hollingsworths did the same with respect to the CSI account or they cashed checks giving the cash to Mr. or Mrs. DeVaughn. Sheila George acted at the direction of Mrs. DeVaughn in disposing of money in the ACS account. DeVaughn, using the name of John A. White, was the signatory for the REC account. Thus, funds in these accounts, which had been paid in return for services the DeVaughns had performed, were reduced entirely to the DeVaughns' dominion and control and were income to the DeVaughns, cash basis taxpayers, in the year they were so reduced. Facts have been stipulated *116 with respect to the subcontractors who paid the sums and the amounts deposited into these accounts as follows: 1971
ACS
Free State
CSI
Total
Gleason Crane
Rental [4]
$ 5,415.13
$ 5,415.13
Western Contracting
$20,000.00
19,750.00
7,000.00
46,750.00
Campbell-McCormick
4,322.81
1,871.30
1,873.27
8,067.38
Ajax
36,000.00
21,500.00
57,500.00
Regal Construction
6,908.80
3,332.10
10,240.90
Cherry Hill
8,065.00
5,000.00
24,567.00
37,632.00
Adelphi
4,000.00
3,000.00
7,000.00
Total
$75,296.61
$30,621.30
$66,687.50
$172,605.41
1972
ACS
REC
Total
Western Contracting
$ 42,000.00
$ 42,000.00
Campbell-McCormick
$ 5,820.33
54,456.99
60,277.32
Adelphi
5,000.00
8,500.00
13,500.00
Albert Beever Co.
10,000.00
10,000.00
F & T
2,500.00
2,500.00
Total
$10,820.33
$117,456.99
$128,277.32 Thus, the total amounts deposited into these four accounts were $172,605.41 and $128,277.32 for 1972 and 1972, respectively. Cash payments from Adelphi.
Respondent asserts that DeVaughn received cash payments from Wattay with respect to *117 the Adelphi deal in the amounts of $16,100 and $21,875 for the years 1971 and 1972, respectively. DeVaughn denies receiving more than $1,200 in cash. However, the record clearly shows that DeVaughn did receive cash from Wattay and that he gave only a portion of it to Leeper and Luppino. DeVaughn was the central figure in this scheme. He initiated discussions with respect to the contract which ultimately was awarded to Adelphi. DeVaughn received all the money that Wattay paid for the contract and then gave Luppino and Leeper their shares. Wattay, Leeper [5] and Luppino all testified about the details of the arrangement--that Wattay would receive the contract with Bechtel and that he would pay 10 percent of his receipts to DeVaughn, Leeper, and Luppino for providing him with the opportunity to win the contract. Wattay testified that, along with the checks that he tendered, he paid cash, the amount of which has been stipulated. He kept track of these payments because he acquired the cash by cashing checks which he caused Adelphi to issue him and gave all but $100 of it to Luppino in sealed envelopes.Luppino testified that he received the cash in sealed envelopes from Wattay and *118 gave the envelopes unopened to DeVaughn, Leeper, or the two men together. Leeper testified that Luppino gave some of the cash to DeVaughn and that on occasion, when Leeper alone received the cash from Luppino, he gave it to DeVaughn. In the face of the corroborating testimony of these three individuals, DeVaughn's bare denial that he received this cash is insufficient to meet his burden of disproving respondent's assertion that these amounts were income to him. Thus, we hold that DeVaughn received in cash from Wattay $16,000 [6] and $21,875 for the years 1971 and 1972, respectively. Cash received from Campbell-McCormick.
Another contested issue is the amount of cash that DeVaughn received from Campbell-McCormick in addition to the checks that were discussed above. The evidence presented to this Court shows that Campbell-McCormick paid cash *119 in additon to the checks which have been stipulated. McCormick paid $1,500 in cash before he saw his competitors' bids in 1970. This amount was paid during a year which is not at issue; however, DeVaughn does admit receiving this amount. McCormick was also to pay $250 per week for the duration of the contract which payments were to commence when McCormick had 12 men working at the Calvert Cliffs site. DeVaughn admits that this arrangement existed but asserts that McCormick incorporated the biweekly payments into the checks which have been stipulated, rather than paying them in cash. McCormick testified that he made these payments in cash to Cumor. He paid this amount every 2 to 4 weeks. Cumor testified that he received this cash from McCormick and delivered it to DeVaughn, retaining 20 percent or $100 of every $500 for himself, as he had induced DeVaughn to accept only $400 every 2 weeks. Both men testified that this arrangement continued until the spring of 1972 when McCormick made his own payments. DeVaughn admits receiving at least one payment from Cumor of $200 or $250. Cumor stated that when he learned of McCormick's intention to pay DeVaughn directly, he asked DeVaughn *120 to continue paying him the 20 percent. McCormick made his first direct payment to DeVaughn at a restaurant where McCormick handed DeVaughn an envelope containing cash. DeVaughn admits receiving $1,000 in cash (4 weeks' payment) at this meeting.Further proof that McCormick was in fact tendering these payments is exhibit AC, an invoice in the name of REC dated April 24, 1973. McCormick stated that DeVaughn had not been giving him invoices for these payments until a dispute occurred concerning a payment that DeVaughn claimed he did not receive.At this point, McCormick demanded invoices for this payment with which demand DeVaughn complied. Exhibit AC is such an invoice and one of the items, four "Floating Picks" for $500 each totaling $2,000, would be 8 weeks' payment. Comparing this to other items on the invoices which were for the 10 percent payments, one observes that the other invoices, exhibits Y, Z, and AA, list Warehouse Storage Space or Patent Scaffolding. Thus, Mr. or Mrs. DeVaughn was distinguishing between the types of payments McCormick was making, and this invoice corroborates McCormick's and Cumor's statements with respect to these cash payments. In light of this evidence, *121 DeVaughn's assertion that he did not receive the additional cash payments is insufficient to carry his burden of disproving respondent's assertion. Respondent contends that, in this deal, DeVaughn received $5,000 in 1971. Assuming that Cumor took 20 percent of whatever McCormick paid in 1971, this would mean that McCormick paid $6,250 in 1971 which would be payment for 25 weeks. The record is not clear as to when the payments commenced; however, it is stipulated that McCormick paid $5,750 for this arrangement in 1971. Assuming that Cumor took 20 percent of this sum, or $1,150, this Court finds that DeVaughn received $4,600 in 1971 in cash from McCormick in addition to the amounts deposited in his four accounts. The parties have stipulated that in 1972 McCormick paid $13,000 towards this arrangement. DeVaughn received 80 percent of the payments until the spring of 1972 when he received them in full. No specific date for this transition is clear from the record, other than that the first check, which McCormick personally delivered to DeVaughn along with cash, was dated March 1972. Thus, assuming that DeVaughn received only 80 percent for the first 3 months of 1972 or 12 weeks, *122 this Court finds that he received $2,400 from Cumor and $10,000 from McCormick directly, or a total of $12,400.
Western checks not deposited into the four accounts.
In accordance with the agreement between Western and DeVaughn, Western issued several checks which, as stipulated, were deposited into the Free State, CSI, ACS and REC accounts. Western issued a check to ACC which check was deposited into the ACCI account. Western also issued a check to Mid-Atlantic. The check issued to Mid-Atlantic was dated May 4, 1972 and amounted to $8,045.92. The DeVaughns stipulated that the money that Western paid to DeVaughn and his associated companies included this item. However, at trial, the DeVaughns asserted that Mid-Atlantic was not their company but rather that of Howard R. Brosenne. Aside from the stipulation, the evidence clearly shows that this item was income to DeVaughn. Mrs. DeVaughn admitted that Western issued its checks to whatever name was supplied them. Mid-Atlantic was never incorporated. Both Mid-Atlantic and ACCI had the same address. DeVaughn co-signed the Mid-Atlantic checks. Mid-Atlantic was merely another funnel through which DeVaughn received funds. Furthermore, *123 at least two checks totaling $8,849.82 drawn on Mid-Atlantic's account were deposited into the ACCI account. The respondent has not asserted that these checks constituted income to the DeVaughns. Instead, he notes that money from Western was deposited into Mid-Atlantic's account which was controlled by DeVaughn, and that subsequently the money was transferred by check into the ACCI account. Petitioners, in asserting that Mid-Atlantic belonged to Brosenne, testified that they had lent Mid-Atlantic money to finance a contract between Western and Mid-Atlantic and that the checks from Mid-Atlantic to ACCI were repayments of this loan. However, other than their word, petitioners, who carry the burden of proof with respect to the amount of the deficiencies, presented no evidence confirming their assertion that money from Mid-Atlantic was repayment of a loan. Indeed, their testimony regarding the details of the loans was inconsistent. No one from Western or Mid-Atlantic testified concerning either a contract between Mid-Atlantic and Western or a loan from the DeVaughns to Mid-Atlantic. No written evidence of a contract or a loan agreement was presented. Again, the DeVaughns' mere *124 assertion that the checks were not income to them is insufficient to disprove the respondent's assertion in light of the evidence presented. Western also issued a check to ACC, the proprietorship which DeVaughn operated upon leaving Bechtel in 1971 until March 1972 when he incorporated. The check amounting to $4,000 is dated May 12, 1972. There is a deposit slip indicating a deposit of $4,000 from Western into the ACCI account on May 23, 1972.
The DeVaughns insist that this item was income to their corporation and thus was properly reported on the corporate return. However, the evidence indicates that this item is properly income to the DeVaughns. The DeVaughns reported another check dated February 18, 1972 which Western issued to ACC on their 1972 schedule C as their income. There is no indication of how this check differs from the check that was deposited into the ACCI account. Western issued both checks to ACC which was the DeVaughns' proprietorship. DeVaughn's testimony indicates that they simply put money into the ACCI account once it was incorporated. Mrs. DeVaughn indicated that this money was paid to DeVaughn due to a contract he had arranged between Western and Rocky *125 Luppino. Although Luppino did testify that he had a contract with Western, he stated that DeVaughn received no money on that deal. Moreover, Mrs. DeVaughn stated that the item which was included in the personal return arose from this deal and that money coming in after incorporation did not go on the personal return. Regardless of whether this item was income from Western due to their contract with Bechtel or their contract with Luppino, as Mrs. DeVaughn testified, DeVaughn must have earned it before ACCI was incorporated and received it afterwards. Thus, because of familiar assignment of income principles that are discussed below, this item was not income to ACCI but rather was income to the DeVaughns in 1972. Albert Beever and Albert Beever Jr. Co. payments.
In 1972 the DeVaughns received money from the two Albert Beever Companies (hereinafter Beever). Much of this money was transferred by Check issued to ACC and deposited into ACCI accounts. The deal with Beever was similar to those that DeVaughn arranged with subcontractors working at the Calvert Cliffs site. If by DeVaughn's efforts Beever acquired a contract with Bechtel at the Millstone site, Beever was to pay DeVaughn *126 a portion of its gross billings. Beever did win at least one contract, dated November 15, 1971, and did pay money. At issue is whether this money is properly income to the DeVaughns personally or to their corporation, ACCI. Although ACCI did engage in legitimate construction business, the evidence indicates that this deal was similar to the others conducted by DeVaughn personally. DeVaughn's payment was contingent upon Beever's securing the contract. In furtherance of this end, DeVaughn paid money to Magis. At least petitioners' records indicate that Magis received a payment from money which the DeVaughns received from Beever through the REC account.The DeVaughns provided false invoices to Beever for these amounts, and Beever would issue checks to any party DeVaughn requested. Indeed, at DeVaughn's request, a check dated August 29, 1972 to REC was voided and issued to "Jack Devaughn." In addition, one of the form contracts which the DeVaughns attempted to have signed is between the Albert Beever Jr. Co. and Free State. It includes change orders indicating payments are to be made to CSI, then ACS, and finally REC but not ACCI. Neither the contract nor the change orders are signed. *127 Thus, this appears to be the same type of deal DeVaughn struck with the other Bechtel subcontractors rather than a legitimate project. Regardless of whether this was a legitimate consulting project, it is clear that the DeVaughns may not assign to ACCI income which they have earned themselves. Trousdale v. Commissioner,16 T.C. 1056, 1065 (1951), affd. 219 F.2d 563 (9th Cir. 1955). This is so even if the income is assigned by an anticipatory arrangement. Lucas v. Earl,281 U.S. 111, 114-115 (1930). Indeed, petitioner may not prevail even if ACCI is a viable tax entity itself or a viable entity for nontax purposes. Schulz v. Commissioner,686 F.2d 490, 493 (7th Cir. 1982), affg. a Memorandum Opinion of this Court; Jones v. Commissioner,64 T.C. 1066, 1076 (1975). The evidence clearly shows that Beever was dealing with DeVaughn personally rather than his corporation. By November 1971 the contract between Beever and Bechtel existed, and DeVaughn had earned the right to the payments. ACCI was not even incorporated until March 1972. All the checks were issued to "Jack DeVaughn," REC, or ACC, which was the DeVaughns' proprietorship. Indeed, Beever issued these checks to whomever *128 the DeVaughns requested, and not ACCI.One of the checks, dated February 7, 1972, and issued to ACC was reported on the DeVaughns' 1972 schedule C. No evidence exists showing that the other checks differed from this one. Also, the unsigned contract which the DeVaughns typed up for the deal with Beever does not name ACCI as a party. Even if it were possible to show that the DeVaughns' corporation, ACCI, rather than the DeVaughns received the money, DeVaughn controlled the money so that he is personally taxable. Johnson v. United States,698 F.2d 372 (9th Cir. 1982); Johnson v. Commissioner,78 T.C. 882, 890-891 (1982); Vercio v. Commissioner,73 T.C. 1246, 1254-1255 (1980). That is, to avoid the attribution of the income to themselves, the DeVaughns must, among other things, show that ACCI had the right to direct or control DeVaughn in some meaningful sense, Johnson v. Commissioner,Supra at 891; see, e.g., Pacella v. Commissioner,78 T.C. 604, 622 (1982). The DeVaughns have failed to show that ACCI exercised any control over either DeVaughn's activities or the money, and therefore the income must be attributed to the DeVaughns.In addition, as respondent suggests, section 482 allows *129 the Commissioner to apportion income between a taxpayer and his corporation to prevent avoidance of taxes. A section 482 allocation must be sustained "unless clearly shown to be unreasonable, capricious and arbitrary." Keller v. Commissioner,77 T.C. 1014, 1022 (1981), on appeal (10th Cir. Apr. 2, 1982). The evidence clearly shows that respondent did not abuse his discretion in attributing the income to the DeVaughns. ACCI had no right to the income. There was no evidence of any contract between ACCI and Beever. Moreover, there was no contract between ACCI and DeVaughn. Thus, DeVaughn was able to and did freely direct the income to himself, ACCI or his other accounts. Furthermore, as respondent points out, the DeVaughns had an obvious motive in assigning this income to ACCI. In 1972 the DeVaughns were starting ACCI which accordingly incurred large costs. It therefore could absorb income without incurring income tax. Accordingly, we hold that this income is taxable to the DeVaughns personally. In amount, there were $41,250.56 worth of checks issued to ACC and one check of $5,000 which was issued to "Jack DeVaughn." In addition, Beever issued a check for $2,817.70 which was *130 deposited into the ACCI account as indicated by Beever's and the DeVaughns' records. The total amount, therefore, is $49,068.26 for 1972. In-kind payments.
Ajax and BMR.
In addition to payments of money, Glen Wheeler's companies, Ajax and BMR, provided services to DeVaughn. This included sums spent on materials and labor for improvements to the DeVaughns' house in the amounts of $4,873.11 and $21,819.32, respectively, payment of $350 to a surveyor for work performed on the DeVaughns' property, and payment of $103.66 for a repair to Mrs. DeVaughn's car. The DeVaughns disputed the labor cost associated with the improvements. Wheeler did not learn that his men were working on the DeVaughns' house until after the fact. In order to ascertain the exact cost of this labor, he told his secretary to calculate the cost using the time sheets of the employees working there.The secretary did complete this task, arriving at a figure of $21,819.32 for the labor. The DeVaughns have submitted no evidence indicating that this figure is inexact. Wheeler never billed the DeVaughns for any of these items, and the DeVaughns never paid for them. It is clear that Ajax and BMR paid for or performed *131 these services because of their relationship with DeVaughn with respect to the work at the Calvert Cliffs site. We therefore hold that the total cost of these items, $27,146.09, is income to the DeVaughns in the year performed, 1971. In-kind payment from Adelphi Builders.
In addition to paying money, Wattay and Adelphi Builders, at DeVaughn's request, completed work on the DeVaughns' house. Through Luppino, DeVaughn and Wattay reached an agreement whereby the cost of this work would be credited against the amount Wattay owed DeVaughn for the contract with Bechtel. Indeed, Mrs. DeVaughn admitted that this item was unreported income to them. Wattay totaled the cost of the work arriving at a figure of $6,607.92. The DeVaughns contested the amount paid for the electrical work which Wattay estimated to be $3,300. In fact, the bill from Singleton Electric was $3,309.42. Thus, the Court finds that the entire sum of $6,607.92 was income to the DeVaughns in 1972. Regal Construction check for $2,024.15.
One final item of income which is disputed is the check issued by Regal Construction to ACS dated November 30, 1971 in the amount of $2,024.15. While Ms. George claims she did not endorse *132 the check, the evidence indicates that the DeVaughns received this item. Luppino testified that he handed the check to DeVaughn, and that he did not know Ms. George or that the ACS account was in her name. The DeVaughns never complained to Luppino that they did not receive this check, nor did they ask him to stop the check. Moreover, the DeVaughns did not supply any other details tending to show that the ckeck was lost or stolen. Thus, we hold that the DeVaughns did receive this item of income in 1971. Splits.
While the DeVaughns received income from these ventures which they failed to report on their returns, they also incurred expenses in order to procure this income. Generally, DeVaughn was considered to be the leader in these schemes. He received money from the various subcontractors and then paid portions of it to various other parties who aided him in securing necessary information, etc. The DeVaughns claim that their payments exceed those which the respondent allows. Respondent has conceded deductions for the payments totaling $53,713.60 in 1971 and $53,137.79 in 1972. The DeVaughns have substantiated most of these payments with checks drawn on either their personal *133 accounts or their four controlled accounts and issued to the various listed parties. In addition, the respondent has allowed a deduction for certain cash payments which have been included in Leeper's income. The DeVaughns claim that they paid additional amounts to these parties, specifically Leeper, Magis and Williams. Initially the obvious must again be noted, the DeVaughns bear the burden of proof respecting these payments. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934); Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. That is, the DeVaughns must substantiate the deductions. See, e.g., Snyder Air Products, Inc. v. Commissioner,71 T.C. 709, 718 (1979). The DeVaughns' proof of these payments consists of their testimony concerning the percentage of incoming receipts which was paid in splits, which testimony is inconsistent. In addition, Mrs. DeVaughn produced a disbursements book which she prepared for DeVaughn's criminal trial and the worksheet which matches receipts with disbursements and which she prepared for this trial. With the exception of an executive diary containing figures which are intelligible, Mrs. *134 DeVaughn produced no contemporaneous records, stating that many of them had been destroyed. Moreover, neither Magis nor Williams testified they had received money from the DeVaughns. Cumor, Leeper and Luppino simply stated that they kept no records. Respecting the records, the fact that they are not accurate was demonstrated at the trial. For example, in the disbursements journal for REC, February 1972, Mrs. DeVaughn indicates that a check was issued to Hollingsworth and that the proceeds were divided among Williams, $700, and Magis, $700, with $100 designated as auto expense. The check, dated February 25, 1972, was simply deposited. Mrs. DeVaughn testified that they would cash checks in order to have money at home and that when DeVaughn paid one of his colleagues, she would "charge" the payment to a check which had recently been cashed. Specifically, the DeVaughns claim to have paid money to their colleagues using the proceeds of checks drawn on the four controlled accounts which were cashed or issued to Mrs. Hollingsworth, John DeVaughn, and Carolyn DeVaughn. For example, there is a check dated June 17, 1971 which was drawn on the Free State account issued to K. M. Hollingsworth *135 in the amount of $3,350. The DeVaughns contend that they used the proceeds of this check to pay $560, $1,500 and $500 to Leeper, Magis and Williams, respectively. However, aside from their word and the disbursements journal, there is nothing to show that these men actually received this money. Mrs. Hollingsworth would give the proceeds of checks she received to Mrs. DeVaughn. There is no indication that anyone other than the DeVaughns received the money when checks were cashed or issued to themselves. Mrs. DeVaughn's records are inaccurate, and the DeVaughns failed to produce Magis or Williams to admit receiving the funds. Thus, these checks simply do not prove the additional payments the DeVaughns claim to have made. In addition, the DeVaughns claim to have made a payment to Luppino by checks drawn on the ACS account in 1971 and issued either to Luppino or his friend, Miss Santoiemma. Mrs. DeVaughn's worksheet indicates that the check dated November 5, 1971 for $4,038 issued to Luppino and the check dated November 30, 1971 for $1,882.50 issued to Miss Santoiemma were payments to Luppino on the Cherry Hill Sand and Gravel deal.However, Luppino denied receiving anything on this *136 deal. The third check, issued to Miss Santoiemma dated December 23, 1971, is in the amount of $2,500. Mrs. DeVaughn's worksheet lists this check as payment for the Adelphi deal. DeVaughn testified inconsistently respecting Luppino's share of the Adelphi payments. Furthermore, a handwriting expert concluded that the endorsements on these checks were forged. Luppino testified that he did not sign or authorize anyone to sign these checks. In addition, the endorsement on the Luppino check is misspelled, "R. Lupino." Mrs. DeVaughn, in her records, consistently misspelled Luppino's name in the same manner, whereas Luppino would be unlikely to misspell his own name. Respecting the December 23, 1971 check for $2,500, Mrs. DeVaughn stated that she gave the check to an employee of Luppino's, who delivered an Adelphi check. However, Mrs. DeVaughn could not recall the identity of the employee, and Luppino stated that he delivered the Adelphi checks personally. In light of this evidence, we conclude that the DeVaughns failed to prove that they issued these checks to Luppino or Ms. Santoiemma and are not entitled to a deduction for them. Additionally, respondent has allowed deductions of *137 $18.94 [7] and $24.25 for the years 1971 and 1972, respectively, for bank service charges and the Annapolis Message fee. Otherwise, the DeVaughns presented no evidence substantiating deductions for items such as entertainment and auto expenses other than their own records which, as noted above, are not credible. Thus, the DeVaughns are not entitled to deductions from the unreported income other than those described above. In conclusion, the total amounts that the DeVaughns received from the subcontractors are $222,375.65 and $230,274.42 for the years 1971 and 1972, respectively. The total allowable deductions are $53,732.54 and $53,162.04 for 1971 and 1972, respectively. The total unreported taxable income is $168,643.11 for 1971 and $177,112.38 for 1972. Fraud.
The final issue to be decided is whether any part of the underpayment of tax for the taxable years 1971 and 1972 was due to fraud with intent to evade tax within the meaning of section 6653(b) on the part of Mrs. DeVaughn. [8] Whether fraud exists is a question of fact to be decided after an examination *138 of the entire record. Stratton v. Commissioner,54 T.C. 255, 284 (1970), modified in a Supplemental Opinion on another issue, 54 T.C. 1351 (1970). Respondent bears the burden of establishing fraud, and he must prove it by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. See, e.g., Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 105 (1969).To establish fraud respondent must show that the taxpayer intended to evade taxes which she knew or believed she owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 111-112 (1956). Fraud may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,supra at 223-224; Otsuki v. Commissioner,supra at 105-106. Circumstantial evidence indicating fraud includes *139 the maintenance of poor or inadequate records, and the destruction of such records, especially where the taxpayer is competent in maintaining financial records, contrivance of false documents, the use of nominee or false bank accounts and concealment of the existence of such accounts, failure to cooperate during an IRS investigation which failure is an attempt to conceal facts, and withholding information from return preparers. Henry v. Commissioner,362 F.2d 640, 643 (5th Cir. 1966), affg. a Memorandum Opinion of this Court; Estate of Beck v. Commissioner,56 T.C. 297, 365-366 (1971). [9] The respondent has clearly demonstrated that Mrs. DeVaughn fraudulently attempted to conceal her income. Mrs. DeVaughn was aware of her husband's dealings with the subcontractors and actively participated therein by aiding her husband, attempting to keep secret the existence of their accounts from Bechtel, keeping books and records, and transferring funds from the bank accounts to the possession of her husband and herself. *140 She knew of the payments that DeVaughn received by check and of at least a portion of the payments received in cash. Mrs. DeVaughn, who had prior bookkeeping experience, maintained whatever records were kept. The only contemporaneous record produced, other than some bank records, was the executive diary which is unintelligible. Mrs. DeVaughn admitted that she burned some records. The created the receipts and disbursements books and the worksheet after learning of the IRS investigation and in preparation for this trial and the criminal trial. Mrs. DeVaughn knew of the four accounts; indeed she was instrumental in opening and maintaining them. She prepared invoices in the names of these accounts indicating the sale or rental of various items which were never sold or rented.
Mrs. DeVaughn hired two accounts, Mrs. Smith and Mitchell, to prepare the returns for the tax years 1971 and 1972, respectively. She neglected to inform them of any of the money coming in from the subcontractors, although it was the practice of both of these accountants to ask about sources of income other than those mentioned. She also failed to tell them of the four accounts. None of the money that went *141 into these accounts was reported on the 1971 and 1972 returns. Both Mr. and Mrs. DeVaughn attended an interview with investigative agents on May 24, 1973 in connection with their tax returns for the years in question. At that interview, Mrs. DeVaughn either lied or remained silent in the fact of her husband's falsehoods about the existence of the four accounts, the existence of a savings account for ACCI, DeVaughn's use of an assumed name, the source of money in their personal accounts, the existence of income other than that reported on their returns and the receipt of a boat from Luppino. After this session, Mrs. DeVaughn told Leeper that she had lied and had withheld information. Mrs. DeVaughn would have this Court believe that she, in good faith, believed that she could report the income on the completed contract method which would have permitted her to delay reporting the income until 1973 or 1974. She stated that she chose this method so as to prevent Bechtel from learning that its subcontractors were paying money to the DeVaughns.However, this use of the completed contract method, rather than indicating a lack of fraudulent intent, demonstrates a belated effort to avoid *142 additions to tax. Nowhere is there an indication that Mrs. DeVaughn intended to use the completed contract method before learning of the IRS investigation. She used the cash basis method in both the 1971 and 1972 returns. Although her accountants may have informed her of the existence of this method of reporting income, they did not discuss it with her in detail until after the investigation began. Indeed, neither of the accountants was told of the existence of income which Mrs. DeVaughn purportedly intended to report using the completed contract method. It was at this time, the summer of 1973, that Mrs. DeVaughn constructed the receipts and disbursements books to facilitate her scheme. She also attempted to secure backdated contracts between DeVaughn and various subcontractors. Although the contracts were dated 1971 and purported to run through 1974, Mrs. DeVaughn used a form that was created in 1972. Mrs. DeVaughn presented Mitchell with the books she had concocted, the false invoices and the contract forms, and Mitchell was told to utilize this information to prepare a 1973 return using the completed contract method. After reviewing the entire record, we conclude that respondent *143 has proved by clear and convincing evidence that the failure of Mrs. DeVaughn to report on returns for 1971 and 1972, at least the money that was deposited into the four accounts, was due to fraud. Respondent also asserts that Mrs. DeVaughn is estopped to contest the addition to tax for fraud for the year 1971 because of ther plea of guilty to Count 30 of the indictment. Since we have decided that respondent has proved the fraud, we have no need to address this issue. Decision will be entered under Rule 155.
Footnotes
1. The check for $5,000 was issued Dec. 20, 1971, but deposited in January 1972.↩
2. At the crimial trial on Mar. 9, 1976, Leslie Wattay testified that one check from 1972, dated July 3, 1972, to cash was for $3,500. However, Ex. 14-N seems to list this check as amounting to $2,500. Also, the stipulation indicates that checks totaling $38,375 were issued. This figure is consistent with Ex. 14-N, but is inconsistent with Wattay's enumeration of the checks.↩
*. In his brief, respondent notes this figure as $5,500. However, this appears to be an error, and the actual figure should be $4,440. ** In his brief, respondent notes this figure to be $23,780.50. However, this appears to be an error, and the actual figure should be $20,780.50.↩
3. See Pershing v. Commissioner,T.C. Memo. 1981-210↩.
4. The DeVaughns allege that this deposit was not income, but that they cashed a check for Leeper. Since the payment to Leeper which Mrs. DeVaughn attributed the this check is being allowed as a deduction, this amount is to be included in the gross income.↩
5. Leeper was not present at this trial. However, his testimony from former trials was admitted without objection as a joint exhibit. ↩
6. Although it was stipulated that Wattay paid $16,100 in cash, in his testimony at the DeVaughn criminal trial, Wattay stated that he kept $100 of the total $16,100 worth of checks he cashed for payments in 1971.↩
7. Although respondent's brief indicates this figure to be $18.54, his worksheet shows that the proper figure should be $18.94.↩
8. The question of DeVaughn's liability for the fraud additions to tax has already been settled. ↩
9. Insolera v. Commissioner,T.C. Memo. 1977-424, affd. 622 F.2d 574↩ (2d Cir. 1980).